NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0575n.06
Filed: August 10, 2006

No. 05-6160

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| THE ESTATE OF LESLIE HARRISON CLEM, JR., DECEASED, et al. | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | On Appeal from the United States District Court for the Eastern |
| WESTERN HERITAGE INSURANCE COMPANY, | ) ) | District of Kentucky |
| Defendant-Appellee. | ) | |

Before: **BOGGS, Chief Judge; and GIBBONS and GRIFFIN, Circuit Judges.**

**PER CURIAM.** This is a diversity insurance coverage lawsuit under Kentucky law arising from the October 2001 death of a teenage boy from injuries that he suffered while riding on a float that had just completed a town parade route in Nicholasville, Kentucky. The decedent's family ("Estate") filed suit in state court against a variety of defendants, including the local Chamber of Commerce ("Chamber") that had organized the parade. The Chamber's insurance company, Defendant-Appellee Western Heritage Insurance Co. ("Western"), refused to cover the loss because, it claimed, the loss fell within one of the policy's exclusion clauses. The Chamber thereafter reached a settlement with the Estate in which it (theoretically) agreed to pay the Estate $6 million and assigned to them its rights against Western, although in exchange the Estate agreed not to collect

-1-

No. 05-6160

Estate of Clem v. Western Ins. Co.

the $6 million from the Chamber itself; in consequence, the state court dismissed the suit against the Chamber with prejudice. Thereafter, the Estate filed suit against Western, and that case was removed to the United States District Court for the Eastern District of Kentucky. Both parties filed for summary judgment, which the district court granted to Western. For the reasons stated below, we affirm.

**I**

The Jessamine County, Kentucky, Chamber of Commerce sponsored a series of local events called the "Jessamine Jamboree" during the week of October 1-7, 2001. Among the week's events was the "Parade on Main," a procession of floats that assembled in the Winn-Dixie parking lot and then marched about 2.5 miles south along Main Street in Nicholasville, Kentucky on October 6. The local high school football team and cheerleading squad participated in the parade and arranged a "float," as they had apparently done in the past. The "float" consisted of a commercial tractor (owned and operated by Glenn Hensley) and a "lowboy" trailer (owned by CMC, Inc.). Hay bales were placed on the trailer, but a portion of the trailer's wheels remained open from above.

Several adults, including the decedent's mother Janet Clem, rode on the float as chaperones. The students were required to sign an entry form that included a "release of responsibility" clause. Leslie "Bubba" Clem, a 15-year old freshman quarterback, rode near the trailer's edge, and apparently he sat near the exposed tires. The float entered the parade staging area in the Winn-Dixie parking lot and pulled onto Main Street after the students and adult chaperones had boarded the

–2–

Estate of Clem v. Western Ins. Co.

trailer. According to one of the adult participants, Sherry Utley, the ride was very "jerky" along the whole route, and the float periodically stopped; it jerked when it started again, causing some children to fall. The float made no turns until it reached Kimberley Drive, at the southern terminus of the designated parade route, where it turned right. It traveled about 150 feet along Kimberley Drive before the truck stopped again, causing another jerk, whereupon some of the children fell again.

At that time, young Clem's foot became entangled between the rear wheel and the wheel well, and he was pulled under the trailer as the truck lurched a few feet forward. Clem was pinned beneath the wheels when the truck finally stopped. As the police statement recounted,

> the victim had his foot on the trailer tire and as the vehicle moved the trailer gave a sudden jerk causing the victims [sic] foot to fall between the trailer wheel well and the tire pulling the victim thru [sic] the tire and trailer wheel well. Witnesses stated [he] tried to pull his foot and leg free but could not.

Clem died about six hours later.

The decedent's estate filed a wrongful death suit in state court against the truck driver, the trailer's owner, the football coach, and the Chamber of Commerce. *Inter alia*, the complaint alleged that the Chamber had duties to promulgate safety standards, to reject noncompliant floats, to monitor floats during the parade for safety, and to expel from the parade those that were operated otherwise. The Chamber of Commerce was insured under a $1 million per-occurrence General Commercial Liability policy by defendant-appellant Western Heritage Insurance Company, with an aggregate limit of $2 million. After reviewing the claim, Western notified the Chamber that Clem's injuries were excluded from the policy by the "participants' exclusion" clause, discussed in greater detail

below.  The Chamber later reached a settlement with the Estate on August 25, 2003, wherein it

agreed to settle for $6 million for loss of parental consortium, wrongful death, and a survivor claim

for damages incurred prior to Clem's death.  However, the monetary settlement was entirely illusory,

for the decedent's estate also agreed not to make any attempt "toward collection of the settlement

amount above-mentioned from the" Chamber, and, any "failure of the [Chamber] to personally pay

such amounts voluntarily shall not constitute a material breach of this agreement nor operate to

invalidate its other terms."  Most pertinently,

> The [Chamber] does hereby fully and completely assign, transfer and convey to [decedent's estate], any and all claims and rights of recourse which it may have against any liability carrier by which it was insured on the date of the occurrence aforementioned . . . [including] the [Chamber's] rights to indemnification for liability respecting the occurrence in question; its obligations under this instrument; and to reimburse for amounts incurred by the [Chamber] in defense of the pending action, and extra-contractual claims for bad faith, and for extracontractual damages. Provided, however, that [decedent's estate] agree to reimburse [Chamber] the actual amount of its reasonable attorney fees incurred to date, not to exceed [$12,500], from any recovery actually recovered . . . .

In other words, the "settlement" not only relieved the Chamber of all liability, it offered the prospect

of recouping all the attorneys' fees that the Chamber had incurred, up to $12,500.  The settlement

was also not to be construed as an admission of liability by the Chamber, and it required the Estate

to execute an order dismissing its action against the Chamber with prejudice, which was effected

in state court on September 8, 2003.

In consequence, the Estate notified Western of Western's purported obligation in April 2004,

claiming that Western was liable for the entire amount of the settlement between the Chamber and

decedent's estate.  Subsequently, the Estate filed suit in state court against Western, and this action

No. 05-6160

Estate of Clem v. Western Ins. Co.

was removed to the United States District Court for the Eastern District of Kentucky on June 18, 2004. On July 7, 2004, the decedent's estate filed a motion for partial summary judgment or judgment on the pleadings, and Western responded by filing its own motion for summary judgment on July 21.

On January 6, 2005, the district court granted Western's motion for summary judgment, holding that the liability for Clem's death was excluded from the Chamber's insurance policy with Western because (a) the policy exclusion language was not ambiguous, and (b) the float was still participating in the parade by heading toward the disembarkation zone even though it had just left the official parade route. The district court therefore did not reach the questions of an insurance company's liability under a covenant not to execute when it wrongly refused coverage and defense or of the settlement's reasonableness. The decedent's estate thereafter filed a motion to alter, amend, or vacate judgment, and the district court denied that motion on June 7, 2005. The Estate filed a timely notice of appeal.

**II**

Because the district court granted summary judgment in favor of appellee, we apply a *de novo* standard of review, "drawing all reasonable inferences in favor of the non-moving party." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

Estate of Clem v. Western Ins. Co.

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must present

significant probative evidence in support of its complaint to defeat the motion for summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

The principal issue here is whether the Chamber's insurance policy obligates Western to

indemnify the Chamber in this particular instance; that is to say, we must ascertain whether the

participants' exclusion clause operates to exclude the decedent's injury from the Chamber's policy

with Western. Kentucky's substantive law controls this diversity case.

**A**

In Kentucky, insurance contract interpretation is generally a matter of law. *Westfield Ins.*

*Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003) (citing *Stone v. Ky. Farm Bur. Mut. Ins.*

*Co.*, 34 S.W.2d 809, 810 (Ky. Ct. App. 2000)). The "plaintiff must show the existence and the

breach of a contractually imposed duty." *Lenning v. Commerc. Union Ins. Co.*, 260 F.3d 574, 581

(6th Cir. 2001). As we have previously noted

> Under Kentucky law, a court should determine at the outset of litigation whether an
> insurance company has a duty to defend its insured by comparing the allegations in
> the underlying complaint with the terms of the insurance policy. An insurance

> company has a duty to defend its insured if the language of an underlying complaint against the insured brings the action within the scope of the insurance contract.

*Westfield*, 336 F.3d at 507 (citing *DiBeneditto v. Med. Protective Co.*, 3 F. App'x 483, 485 (6th Cir. 2001)). However, the duty to defend in Kentucky is broader than the duty to indemnify, for "insurers have an obligation to defend if there is an allegation which potentially, possibly or might come within the coverage of the policy." *Lenning*, 260 F.3d at 581 (citations and internal quotation marks omitted). As such, "even if an insurance company denies coverage based on the mistaken belief that it is justified in doing so, the company may still breach its contact with the insured." *Ibid.*

To determine whether an insurance company has violated its duty to defend under Kentucky law, courts must first determine whether the relevant policy terms are ambiguous. The Kentucky Supreme Court has held, in the context of uninsured motorist coverage,

> When faced with the necessity of construing such statutory and contractual language, we must look to prior pronouncements of any policy by which such insurance contracts will be interpreted by the courts of Kentucky. In so doing, we find that two cardinal principles apply: (1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and (2) exceptions and exclusions should be strictly construed to make insurance effective.

*Ky. Farm Bur. Mut. Ins. Co. v. McKinney*, 831 S.W.3d 164, 166 (Ky. 1992). As such, "Kentucky should adhere to its stated policy of liberally construing insurance contracts in favor of the asserted 'insured' to provide insurance coverage and thereby make insurance effective." *Id.* at 167. Kentucky's Supreme Court has not limited its policy disfavoring exclusion clauses to situations where statutes regulate particular types of insurance: "Kentucky law is crystal clear that exclusions

are to be narrowly interpreted and all questions resolved in favor of the insured." *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky. 1992). However, this is not to suggest that Kentucky has pronounced exclusion clauses entirely inoperative. *Ky. Farm Bur. Mut. Ins. Co. v. Thompson*, 1 S.W.3d 475, 476-77 (Ky. 1999) (recognizing that only the legislature can establish public policy, and that prior holdings abrogating certain exclusion clauses were based on legislative acts). Thus, the interpretative canon disfavoring exclusion clauses operates only where the policy language is found to be ambiguous.

"An essential tool in deciding whether an insurance policy is ambiguous, and consequently should be interpreted in favor of the insured, is the so-called 'doctrine of reasonable expectations.'" *Simon v. Cont. Ins. Co.*, 724 S.W.2d 210, 212 (Ky. 1986). That is to say, "[a]n insurance contract must be construed according to its true character and purpose, and in accordance with the intentions and expectation interests of the parties." *Nat. Ins. v. Lexington Flying Club*, 603 S.W.2d 490, 493 (Ky. Ct. App. 1980). Therefore, the language of an insurance policy "must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured." *Fryman v. Pilot Life Ins. Co.,* 704 S.W.2d 205, 206 (Ky. 1986).

Finally, an insurance company that mistakenly fails to defend an insured is liable for reasonable settlements under Kentucky law. *Interstate Cas. Co. v. Wallins Creek Coal Co.*, 176 S.W. 217, 219 (Ky. 1915). When the insured reaches such a settlement without the insurance company's defense, the insured "is entitled to recover all damages naturally flowing from the

breach." *Grimes v. Nationwide Mut. Ins. Co.*, 705 S.W.2d 926, 932 (Ky. Ct. App. 1985). Such settlements by the insured "will not be rescinded for fraud unless the evidence showing fraud is clear, unequivocal and convincing." *Gumm v. Combs*, 302 S.W.2d 616, 617 (Ky. 1957).


**B**

As an initial matter, we must determine whether Western violated the terms of its insurance contract with the Chamber by refusing to defend. Pertinent to that inquiry, we must ascertain whether the contract's relevant policy terms are ambiguous. Kentucky's courts have taken broad views of 'ambiguity' in the past. For instance, the Kentucky Supreme Court has recently found policy exclusions relating to losses suffered "while committing or attempting to commit a crime" and "treatment for injuries sustained as a result of being under the influence of alcohol" to be ambiguous. *Healthwise of Ky., Ltd. v. Anglin*, 956 S.W.2d 213, 216 (Ky. 1997). In that case involving injuries sustained while drag-racing under the influence of alcohol, the court held that, although "[w]e believe that the average person would view Anglin's behavior in this case as criminal," nevertheless, "we do not believe that the word 'crime' . . . should be defined as the ordinary person would use the word" because "[p]eople often use the words 'crime' and 'criminal' to describe actions which, though perhaps reprehensible, are neither illegal nor unlawful." *Ibid.* Following the state's policy of adopting the interpretation most favorable to the insured when an exclusion is ambiguous, the court found that the policy only excluded misdemeanors and felonies,

whereas drag racing "is a traffic infraction . . . and is not a 'crime' as defined in [the state's] Code." *Ibid.*

Similarly, Kentucky's courts have found that an injured motorist was covered by her motor vehicle insurance despite the fact that she was injured while driving her car by a rock that was flung from a nearby lawnmower. *Ky. Farm Bur. Mut. Ins. Co. v. Hall*, 807 S.W.2d 954, 955 (Ky. App. 1991). This would seem to follow the decisions of sister states upholding insurance coverage despite the presence of athletic exclusion clauses for a golfer who was injured by lightning while hiding from the thunderstorm (and therefore not playing golf any longer) under a tree on the golf course, *The Glens Falls Group Ins. Co. v. Simpson*, 439 S.W.2d 292, 294 (Ark. 1969), and for a softball player who was injured while retrieving a ball that had been hit out of the park after the softball game had apparently ended. *Town of Surfside, Fla. v. Morrison Assurance Co., Inc.*, 394 So.2d 530, 530-31 (Fla. Dist. Ct. App. 1981). But it is worth noting that Kentucky's courts have also required employees to allege some causal nexus between their duties as employees and their driving of a company-provided automobile closer than mere commuting in order to state a valid workers compensation claim. *Davis v. Southeastern Stone Quarries, Inc.*, 464 S.W.2d 258, 259 (Ky. 1971) (injured party was "coming or going" to or from work when injured, and therefore not covered by workers compensation). *See Harlan Collieries Co. v. Shell*, 239 S.W.2d 923, 925 (Ky. 1951).

Kentucky's courts have required that the nexus connecting the injury to the insurance coverage be more than merely incidental to afford coverage. For instance, the Kentucky Supreme

No. 05-6160

Estate of Clem v. Western Ins. Co.

Court has required a nexus between the operation of a vehicle and indemnity stronger than mere proximity to the covered vehicle. *State Farm Mut. Auto. Ins. Co. v. Rains*, 715 S.W.2d 232, 234 (Ky. 1986) (motorist denied recovery under statutory motorist reparations benefit plan when struck by a baseball bat while trying to enter his car during a fight with people who were already fighting on and around his vehicle; this case was consolidated with another involving the intentional shooting by a third party of the insured while he was in his car, for which the court also affirmed summary judgment). Very recently, the Kentucky Supreme Court has held that an insurance company was not required to indemnify local elected officials who were found to have violated provisions of the Kentucky constitution prohibiting elected officials from increasing their salaries during their current terms of office. But the insurance policy in that case covered only breaches of fiduciary duty and commissions of torts, and the state supreme court held that their violations involved neither type of offense. *Ky. Assoc. of Counties v. McClendon*, 157 S.W.3d 626, 628 (Ky. 2005).

Returning to the instant case, it is not disputed that the Chamber's policy had the following "participants' exclusion" clause:

> Such insurance as it provided by this policy does not apply to, and the Company shall have no duty to defend any action brought to recover damages because of: A. "Bodily injury" or "personal and advertising injury" to any person while practicing for or participating in any contest, demonstration, event, exhibition, race or show. As used in this provision any person shall include but not be limited to participants, attendants, mechanics, stewards, timing officials, announcers, corner men, musicians, singers, animal handlers, officials or any other person employed by or doing volunteer work for the named insured.

Clem was killed *after* his float had completed its tour on the parade route but *before* he had debarked the float. The float was undoubtedly headed for a locale where its passengers could disembark (for

–11–

it could not stop on the official parade route to debark its passengers), and it was within about 150 feet of the parade route's official terminus when Clem was killed. Thus, the question before us is whether the word *participation* as it is used in the policy is sufficiently ambiguous to require us to define the term in a reasonable manner favoring coverage. If so, we must then determine whether the resulting construction would reasonably allow us to find that Clem's injuries were not subject to the insurance company's policy exclusion clause.

We find that the contractual phrase "practicing for or participating in" is not ambiguous. The exclusion clause's purpose is evident on its face: participation in town festivities, particularly in parades, creates a heightened risk of injury, and the insurance company was unwilling to indemnify that risk at the premium rate that the Chamber was willing to pay. We believe it follows as a "reasonable expectation" that riding on a parade float constitutes "participation" in a parade, and that the outer limits of such "participation" are best defined in the instant case by the fact of riding on the float rather than the float's location with respect to the parade's official viewing route.

Riding on an open-top parade float is an inherently unsafe activity, for passengers are typically not provided with any of the normal safety devices that ordinary automobile passengers enjoy. As such, riding on a float constitutes a special activity specific to a parade, distinct from riding on a vehicle to meet transportation needs, and the float's riders would necessarily be aware of their participation in a parade by riding on the float. Moreover, reasonably large parades necessarily require some staging area before and after the parade's official viewing area for the floats and other parade marchers to congregate and organize. Specifically, people intending to ride

No. 05-6160

Estate of Clem v. Western Ins. Co.

on floats must get on the float at some point prior to the official "beginning" and they then must be given the opportunity to get off the float at some point after it has passed the viewing area's terminus. In the instant case, the parade's organizers had specifically ordered the floats to debark their riders somewhere other than at the official terminus so as to avoid generating a traffic jam that could bring the parade itself to a grinding halt, though the organizers did not identify a specific place where passengers could get off the floats.

The Estate strenuously argues that the decedent was no longer participating in the parade because the float had left the parade's official route by the time of the accident. We do not agree. Whether a float could travel beyond some outer boundary so that its riders would no longer be participating in the parade by their lack of proximity to the parade route would require us to engage in needless speculation. It is unquestioned that the float in this case had just left the parade's viewing terminus, had traveled only about 150 feet further, and had not yet provided its riders with any opportunity to debark. Whatever the possible merits of this argument on other facts, no reasonable trier of fact could find that traveling 150 feet with no opportunity to debark constitutes exiting the parade's zone of participation.

In consequence, we hold that the policy exclusion clause was not ambiguous, and we further hold that the clause operated to exclude the decedent's injury from the insurance policy's coverage because his injuries were incurred at a time when he was still participating in the town parade. We therefore do not reach the questions respecting the reasonableness of the settlement or the effect in Kentucky of the Chamber's agreement with the Estate.

No. 05-6160

Estate of Clem v. Western Ins. Co.

# III

We **AFFIRM** the district court's grant of summary judgment to Western.